Good morning. Eric Rill with the Michigan Department of Attorney General. On behalf of the plaintiff appellants, I'd like to reserve five minutes for rebuttal. May it please the This case has been exhaustively briefed already. In fact, I think in my career I cannot think of a case that has been more extensively briefed between the lower court and the appeal briefs in this case. I mean really my difficulty this morning was trying to decide on what to focus. And I think the best way to approach it would simply just kind of direct to what I think are the main questions of the issues presented in the appeal. I'd like to start with first with the issue on strict scrutiny. And I think the question here is simply can states create strict scrutiny offenses? And I think the answer is pretty conclusively yes. The United States Supreme Court has never Can you talk in scrutiny or liability here? I'm sorry, strict liability. I apologize, Your Honor. Strict liability. The United States Supreme Court has never held that states are constitutionally barred from creating strict These cases concerned whether or not Congress intended to create strict liability offenses, not whether or not it was permissible for them to do so. Moreover, those only addressed federal statutes and they were not applied to the states. If more set were to be applied, I think you'd also have to apply the part of the decision that notes that there is no general rule against criminal offenses without acquiring criminal intent. Moreover, in this particular statute, there is expressed intent to create a strict liability offense. Michigan Compound Laws 28-729 distinguishes between willful violations and merely failure to comply. In the People v. McFaul, the Michigan Court of Appeals has already reviewed and concluded that this was an expressed plain language determination that this is an intent to create a strict liability offense. Does the statute attempt to distinguish among the provisions of the law as to what is strict liability and what may require intent? Or there is no effort to distinguish which of the pretty sizable number of crimes are created require strict liability or not? Well, the language of the statute says willful violation and makes the willful violation a felony. Simple failure to comply is made a misdemeanor. So I think the inclination there is, well, if you knew what your obligations were and you deliberately avoided them, well, that's a felony violation. The lesser strict liability issue comes in if, well, you know what, there was a particularly marginal case. I didn't know it was unintentional. I think one of the examples that's been offered in the briefing and that the plaintiffs have previously pointed to is the idea of, well, if you're in the hospital. Well, first of all, I would point to the idea that I doubt that there's any police officer or prosecutor that's going to try to prosecute an offender who is... One wouldn't want to have to rely on that, though, would one? Well, it's not so much a matter of relying, Your Honor. I would more point to the idea that I think that would be, if that were to be arrested and were to be charged, I think very unlikely, and I think I would feel comfortable relying on the idea of, ladies and gentlemen of a jury, would you convict someone on that basis? But even putting that to the side, were that to arise, that would obviously be a failure to comply situation, not a willful violation. And in that circumstance, that would only be a misdemeanor. Counsel, could I ask you, does the Michigan Attorney General's Office have a policy in which it writes letters to certain designated people who may ask for an interpretation of a particular statute? Many of the Attorney General's Office, State Attorney General's Offices around the United States have a policy of a section of the office which writes such a letter of interpretation. But does Michigan have such a policy or such a section of its office that writes interpretive letters? We do, Your Honor. The Michigan Department of Attorney General has, in fact, an Opinions Division that focuses expressly on that. In this particular circumstance, for one reason or another, there hasn't been a whole lot of inquiry on this. And I think part of that is reflective that there simply are not very many prosecutions for violations of the student status. You don't have any letters you've issued? There is one, Your Honor. And I think that it's in the record in this case. And it dealt with whether or not an offender dropping off their own child at a school, did that contravene the student safety zone around the school. And the opinion, as I recall, was that so long as you're dropping off your own child and you're not hanging around and observing other minors, that's not a violation. And certainly, that same process is available for other marginal or unique circumstances available. But at this point in time, there just simply has not been many. There are so many different ways that a person might have to go close to a school, I mean, to pay your taxes or to, you know, a lot of, a huge number of reasons, commercial reasons or the bus station or whatever. But there's no interpretation by the Attorney General's Office, other than the one you mentioned, about those kinds of things. And again, simply it's because our office has not been asked. But I think as far as going to a school or being near a school, and this would probably be something to, you know, I would address more in the idea of whether or not the definition of the student safety zones or the measurement of it is vague or unconstitutional. But it's important to note that the only issue with being near a school is if you're residing, if you're working, or if you're loitering. And under the definition of loitering, it only really concerns are you in, are you at near, within the student safety zone for a period of time, and under the circumstances that a reasonable person would conclude that your primary purpose is for observing or contacting minors. So you can be within a school. But doesn't that set forth a really subjective criteria, and is that enough to give notice to people who might be affected by that? Because from the record, I see that there are differing interpretations or perceptions of what all of this means, and so I'm not sure that there's that kind of definiteness that would provide notice to people. I would respond, I think there is a definiteness because it's not just a matter of, well, you're near a school and maybe it counts or maybe it doesn't. Again, we've got several triggers within that definition. The first is for a period of time and under circumstances. So already it's not just a matter of I was passing through a school and I'm now loitering. Would you go to your own child's play? No. And I think the reason for that is because that gets into the idea of the primary purpose being to observe minors. There's no way to watch only your own child in a play or in a football game or some other activity. How would you know whether you're prescribed or not prescribed by reading this statute? And again, I would point to the period of time and the circumstances that suggest that your primary purpose is for observing or contacting minors. Walking through a school, having a parent-teacher conference. If your primary purpose is to go watch your child perform in a play, you're still guilty? It is because your primary purpose is to observe or contact minors. There's no way to watch and observe only your own child. But the primary purpose of that person is to watch their child. And I know you're saying you can't do it, you can't just watch your child, but if you look at that person's, I mean, are you looking at primary purpose from the perspective of the, I guess the defendant or the individual who's making the challenge? And again, but it's the primary purpose, it's not simply a matter of I was there, I passed through, and accidentally loitered. You're there for long enough, your circumstances suggest that you're not just walking through, minding your own business. The whole purpose of this definition is to capture and distinguish between just being within the zone. So going to the school to pick up your own child, if it required more than, say, a few minutes, that would bring you within the ambit of the statute? As the Michigan Department of Attorney General has interpreted, no, picking up and dropping off your own child is not loitering. No, but I said if you have to wait for a period of time, let's say you have to stay there and wait for the child 15, 20 minutes. And I think this gets what's into the idea of the period of time and the circumstances that suggest that your primary purpose is not for your own business, it's for observing and contacting minors. Now, if you drop off your own child and then you just kind of hang around in the parking lot for an hour, two hours, three hours. It's your opinion, counsel. I mean, some other prosecutor may have a different opinion. I mean, is this discretionary? With the prosecutor, we don't normally think that the rule of law allows just pure discretionary law. That's mainly what monarchs do. I don't believe that it is purely discretionary, Your Honor. I think that there is enough definition within the structure of loitering to both provide advance notice and an understanding of what is being prescribed here. This is designed not so much to get people passing through a school zone, it's trying to get the person that is standing outside the playground for a long period of time watching kids play, and that's what we're trying to capture here. This is not a matter of trying to play gotcha and surprise, you're a violator. We're trying to direct it at specific conduct. Have the Michigan courts themselves, like the Michigan Supreme Court, ruled on any of these questions? I'm sorry? Has the Michigan Supreme Court ruled on the meaning of any of these questions? Not yet, Your Honor. I believe there is currently a case pending in front of the Michigan Supreme Court that they have asked for a briefing on the definition and the interpretation of this language. They have not yet ruled. The argument has not occurred yet. And how long has it been in the Michigan Supreme Court? Not very long. I only became aware of it earlier this month, so I think that the briefing letter was sent out, I think, November or December. What issue or issues do they seem to have before them? Your Honor, I could not recite it with specificity. I know that it is available publicly, but I wouldn't hesitate to try to describe or recite it myself at the risk of misrepresenting it. With that, Your Honor, I would close simply by saying that I believe, first of all, that strict scrutiny is, I'm sorry, strict liability is appropriate here, and also that the definitions provided in the statute are reasonably understood by a person of ordinary intelligence and are not vague. And I'll reserve the remainder of my time for, well, I don't have any more time. Good morning, Your Honors. The defendants here, in their briefs, ask you to make decisions based on fear. We're asking you to make your decision based on the facts and, in particular, on the extensive record in this case. And what that record shows is that SORA is incomprehensible both to registrants and law enforcement. It also shows that SORA restricts virtually every aspect of plaintiff's lives, from where they can live, to what jobs they can have, to whether they can go to their kid's soccer match. In the second round of briefing, we've addressed whether that all-encompassing regulation can be retroactively imposed. The question for you today is whether the State, whether plaintiffs should be strictly liable if they fail to comply with this web of restrictions that they cannot understand. Let me start with vagueness. There are three areas where the District Court found fault. The exclusion zones, the loitering prohibition, and certain reporting requirements. With the exclusion zones, we're dealing here with conduct that is entirely innocent. Working, living, parenting. That's otherwise legal. It's legal for all of us, and it's legal for registrants unless they are inside the exclusion zones. So for them to know whether they're committing a crime, they need to know where the exclusion zones are. On the exclusion zones, and, you know, on first reading, it seems that that provision that says 1,000 feet is sufficiently definite. You find fault with that in saying that it lacks, you know, measurement criteria to make it as definite as I would have thought it to be. Also, counsel for Michigan says that this is not a gotcha kind of thing, and it's sufficient to put people on notice, that people who go and need to pick up their children as long as they don't stay and loiter and lurk, you know, that's sufficient. So if you added language to the statute in line with what counsel said, would that be enough to cure the constitutional problem? And if you defined further the 1,000 feet, like from the property line or whatever, would that be enough to cure it in your mind? So let me, I want to make sure I address all aspects of that question. First, on the gotcha question, the record actually here shows that there are gotcha situations. For example, the Michigan, the former Legal Affairs Director of the Michigan Department of Corrections was an expert witness for us. He testified that in his role, he would see parolees who would ask their agents, can I, under SORA, can I go to my kid's soccer game? Can I take a temporary roofing job in this area? Those individuals, the parolee agents were looking, and these are specialized agents who do nothing but manage sex offenders. They would say, yeah, you're fine. SORA says you can do that. The prosecutors would then turn around and arrest them. That would result in returns to prison because a SORA violation is an automatic parole violation. So those are gotcha situations. Another situation, one of our witnesses is a former registrant. He was unclear. The law keeps changing. He went in to inquire, said, now that the recent law changes, do I have to report once a year or more than once? He was told once by the police, got it in writing. Turns out he had to report more than once. He was prosecuted. So there are gotcha situations, and that's very clear from the record. The question of measurement that you ask, there are two ways in which the statute is unclear on measurement for the exclusion zones, and the district court identified both of those. One is the question of where you start and where you end the measurement. So if you start at the school door and you measure 1,000 feet, you get to here. If you start at the parcel where you end the measurement, if you end the measurement at where the house is, where the factory is where you're working, versus if you take the entire parcel on which the house or the factory sits. There are some maps in our brief, and I would refer you to the expert reports of Peter Wagner that have extensive maps that show how this works. These are not circular zones. These are zones that zigzag in all sorts of directions. So that's the one problem, where you measure from, and there's a, I think it's a Second Circuit case that addresses that precise issue that's mentioned in our brief about how you can have a definite distance that is never thus unclear because you don't know where to start from. The bigger problem though, and that could be cured by specifying in the statute you measure from the property line, which is how defendants would have us measure. The bigger problem is that if you measure from the property line, people don't know where parcel boundaries are. You can't walk down the street and see this part, the federal courthouse, maybe you can in the federal courthouse, you can sort of see where it is, but if you're in a town, you don't know which, does this parcel belong to the town or to this school, this football field, and where's the boundary? Here's a field. Does that belong to this farmhouse or that farmhouse? How do you know where the parcel boundaries are? So absent marking this in the physical environment, registrants weren't going to know. The sex offender unit, the Michigan State Police sex offender unit, could not get parcel data. It does not have parcel data itself to measure this. And so what we see in practice, I mean there's two recent cases that have been filed. This is the reason that we're asking for this court to modify, not simply to affirm the district court, but to modify, to remain with instructions to modify the injunction to be facial. There are two recent district court cases that have been filed, one in the Eastern and one in the Western District, that exemplify this problem where, for example, the one in the Eastern District, this individual had worked for two years in a job, reported regularly that address. The police two years later say, you know what, we've looked at this again. We think now that this is an exclusion zone. Before we thought it wasn't, now we think it is. You've got to quit your job. The one in the Eastern District that's just been filed, that individual, he was looking for a home. He went to the police station and said, this is the apartment I'd like to rent. He was told, yeah, this is fine. You're not in an exclusion zone. He goes, lease is signed, comes back to register that address. He's told, actually, we're looking at a different database now, and now we think it is an exclusion zone. You've got to move, even though you haven't. Have Michigan state courts done anything to clarify the meaning of this statute under state law? There has been some litigation, but not a tremendous amount that I'm aware of. In this case in the Michigan Supreme Court, does it raise some similar questions to the ones you've got here? I'm not certain if Mr. Greel is referring to the Temelkowski case, which is the case that I'm aware of. That case actually has much more to do with an issue that's raised in the second round of briefing with Doe number two, and whether individuals who were promised under the plea bargaining issues. I haven't looked at that case very closely, but there's ex post facto issues, and also issues about, essentially, specific performance of pleas where individuals have sealed adjudications, if that's the case he's referring to, which is the one that I'm aware of that's in the Supreme Court. So it would not address these types of issues around the interpretation. And the thing that I want to make sure that is clear is that this affects every aspect of an individual's life. So if, for example, take Doe number four. He works in retail. He knows that he's got to report his job, but his... And this happened during the course of this litigation. His employer says, you know, we're short staffed over in this store. I'm going to send you there for the day. What's he supposed to do? Does he have to report that? What if it's in an exclusion zone? How does he know if it's in an exclusion zone? How long does he have to work there? Let me ask you this. If we agree with the district court here and affirm, what does that do overall to the statute? Does it have to be... Does the legislature have to reconsider the statute, presumably, and pass a different type of statute from the one they've adopted? What would be... Is your purpose to undermine the whole statute and get something different from what you've got now? Well, I think that's a separate question with respect to strict liability versus vagueness. With respect to strict liability, I think what the district court here did was absolutely right, which was very modest and was simply to say, if you're going... I'm not striking down the statute, but I'm saying if you're going to enforce this statute, there has to be mens rea. So with respect to the strict liability piece of it, I think what the district court did is exactly right. It has to be global. With respect to vagueness, I think there really is a question of a facial injunction against the provisions that the district court correctly identified as vague, which are the exclusion zones, the loitering provision, and the specified reporting requirements. Well, that undermines... That basically undermines the statute in its entirety, I guess, right? Well, there are portions of the statute that would survive, but the zones would need to be enjoined, and the legislature would, of course, be free to try to revisit that issue and address its concerns in another constitutional way. But that piece of it, because they're vague, and I don't think there's really a way to cure that vagueness simply by saying, we're going to measure from this particular point, because there's no way for individuals to know where those parcel boundaries are. This has come up in a number of state statutes, I take it, same type problems, of the breadth of the language and the uncertainty of the language. I don't actually think it's been that... In terms of the SORA issue, it has generally not been litigated as a vagueness or strict liability issue. It's largely been litigated around ex post facto, which, of course, we look forward to addressing down the road, and the question of whether or not there should be individualized review. Those issues have been addressed, but the issues before you today have really largely not been litigated, and I... Why do you think that is? I think partly it's because of the practicalities of the fact that these are very unpopular people. It's very difficult for them to get representation. Typically, you see where individuals are bringing challenges. It's in the context of criminal appeals, and there's not a lot of lawyers out there that are willing to stand up for clients who are this unpopular. It's also because, while registration is fairly... All states have some kind of registry, and they vary a lot. Some of them are risk-based and have individualized assessments. Some of them, like Michigan's, are conviction-based. The exclusion zones, Michigan has many... There's a relatively small number of states that have exclusion zones, and the states that do, most of them have residency only. Michigan's exclusion zone is extraordinary in that it covers employment, and that it covers the loitering, which is effectively a ban on parenting, because you can't... The state itself doesn't know whether you can look at your own child, and if you can't look at your own child, and you can't know where these zones are, I don't know how you even walk around town. We know that there are approximately 40,000 people in Michigan who are said to be subject to this registration requirement. Is that right? Yes, it's between 40 and 49. It goes up by about 2,000 years, so I'm not sure what the current number is. How many of those, or I guess we know or don't know, are forcible rape type cases, and how many of your plaintiffs in this case seems to be consensual sex, but as teenagers or something where there's more than four years difference in the age. Do we know how the categories come out there about forcible rape versus the other crimes? I don't think we know, because Michigan doesn't organize it that way. We have basically one of the biggest problems, and this really goes into the second round, is that Michigan's registry is conviction-based rather than risk-based, and the experts are very clear that there's a very small number of people. There are people who are dangerous, and those people should be monitored, but that's a very small percentage of people who commit sex offenses. It's counter to sort of the public... How do we know that? Why do you think that is true? It's very clear from the record, Your Honor. If you look at the Faye DuMain reports, if you look at the Levinson reports, it's very, very clear. Dr. Faye DuMain, she works from the state of Michigan in the Center for Forensic Psychiatry, assessing individuals on competency and sex offender issues. She testified, in 20 years, I can count on one hand the number of people who are serial offenders. This is contrary to the popular perception, so we've it has the fourth largest registry in the country, with over 40,000 people. Your position is that it's only a very small percent who are actually dangerous, and the rest of them are, I guess, many different types, but basically consensual sex and that kind of thing. I'm not sure that I would say that the majority are consensual sex, but I would say that we don't know because we don't look at, the registry isn't organized in that way. It's simply, basically the way the state does it is to say, if you have this type of conviction, you can be Doe number four here who, you know, meets his, he meets his, the woman who is now his wife in an over 18 club. Basically, the bottom line is we don't really know what percent is forcible sex and what percent isn't. I mean, we just don't know the answer to that question. We don't know, I'm not sure I can tell you broken down in terms of what types of crimes because, you know, Mr. Rill will tell you, well, there's a, you know, everybody here is tier three. Well, tier three is Mr. Doe number four and it's somebody who has a forcible rape, right? So we throw in people like Doe number four who's married to the woman who was the victim and the person with the forcible rape. What we do know and what is very clear from the record is that there are many, many, many people who are not dangerous who are on the registry. We also know that recidivism risk drops off dramatically over time. That's also very clear from the record. And that lifetime registration simply makes no sense. There's no purpose to it because of the way recidivism rates drop over time. These other state statutes require a showing of present dangerousness. So, I haven't done a lot of research in how other states work. There's a great variety in terms of some of them have, you know, individualized hearings. Some of them have sort of petitions for removal. There's, you know, there's a variety of different ways that this works. But basically what we're asking for is an individualized review, the opportunity to demonstrate, the opportunity, people shouldn't be on the registry unless they're presently dangerous, unless there's a risk. Because of the enormous burdens that it poses on people, there needs to be that individualized determination. And this really goes to the Hendricks case where the Supreme Court said... That's not present in this case. It's present in... It's present in the other round. Other case. We're merging over into the other round. I see my time is up. If the panel has other questions, I'm happy to answer them. I have just one. When you're talking about this individualized assessment and you're talking about dangerousness, it seems that under the statute, if you're looking at the breadth of the statute, that as it's currently configured, it is broad enough to sweep in people who are dangerous, but there's no explicit sexual connection. Such as the guy who was, I guess, the robber, obviously dangerous, and he kidnapped somebody dangerous. But there didn't appear to be a sexual component to that, but he's in the sexual registry. Am I reading that right or wrong? That's absolutely correct. So the statute includes people who never committed a sexual offense. They are labeled by the state as sex offenders, stigmatized as sex offenders, required to recidivate when they didn't commit a sex offense in the first place. You also have people like Doe Number Two who were never convicted. You have people like Doe Number Five who committed a sex offense over 30 years ago, who didn't commit any other sexual offense, then ends up stealing some scrap metal. That puts him on the registry. So we have this wide range of people who are on, some of whom are sex offenders, some of whom are not, some of whom are convicted, some of whom are not. There needs to be individualized tailoring if we're going to impose these burdens. Are there equal protection issues involved in the way you've got the armed robber over here, dangerous with a gun, who gets his sentence, does his time, has three years supervised release, and then when that's done, he's okay, and you've got the other person who, like What kind of problems does that raise when you're looking at these two people who are standing side by side? We didn't raise equal protection claims in this litigation, but I think one of the things that's very clear, and you look at the Supreme Court's decisions and Smith v. Doe and Connecticut, the two Supreme Court decisions, they make it very clear that their decisions are limited to the specific statutes before them and the specific claims that they're brought. And you see in the dissents and concurrences saying, we think there's a bunch of other challenges that are out there, we're kind of troubled by this idea that you've got consensual teen sex, people who are having consensual teen sex ending up on the registry for life and being, I mean, that was a first-generation statute, that was not in-person reporting, that was not life, that was not exclusion zones, that was not this sort of sweeping array of things that people have to report, that wasn't affecting parenting. Even then, the Supreme Court, closely divided, was very concerned and said explicitly, there's a bunch of other challenges that are out there, and kind of invited us to bring them, and we have. Thank you. One last question. Is there any book or extensive writing, law review or otherwise, about this problem nationwide that describes the laws that the states have and how many states have the history of this problem, so to speak, and the present, or pretty close to the present situation, or not? There's an excellent law review article cited in our brief by Catherine Carpenter, which is called something like the evolution of the unconstitutionality of sex offender laws, that looks at the history of the way these laws have evolved. I would also refer you to... Is that in the Hastings... Is that this Hastings article or not? It might be. I can't recall, Your Honor. I would also refer you to the expert report of James Prescott, who is a University of Michigan law professor and economist, that's part of the exhibits in this case, who talks about the way in which sex offender registries have evolved. He has compiled a compendium of just the major statutes affecting registration that's over a thousand pages. They're different in every state, they're different in every town, which makes it very, very difficult. But those are the two sources that I would point the Court's attention to. Thank you, Your Honor. Thank you for the additional time. I would like to further up on the early record. The case I was referring to was the Temelkoski case in Michigan. I want to also address one of the comments, the idea that sex offenders are so unpopular that they have difficulty obtaining lawyers. I can speak only from my own personal experience in defending the statute. I have encountered many different attorneys raising issues at the circuit court level and at the state court level and at the federal court level. I would also suggest that the reference to the other cases that counsel mentioned is kind of inappropriate in this case. It is newly filed, and in fact, one of the cases that was described has not actually been filed yet, or at least it hasn't been served. Suffice to say, those cases are not in the record here. The allegations are just that, they're allegations. We haven't even filed an answer to these claims yet. So I think that that would be, I would be very cautious about trying to use those cases as leverage or demonstration. The general problem here is that the statute is open to so many different interpretations, for example, about zones, but other aspects of it as well, that it's not really what you people don't know what it covers and what it doesn't cover. Respectfully, Your Honor, I would disagree. I think the statute is, I think, very well. You think it's definite? I think that it is, particularly if we're looking at the student safety zones, it's a thousand feet from the school, and if the issue is, well, we don't have parcel boundaries, we cannot create these, you know, very complicated, very detailed maps, that's not necessary. It simply is not. If I want to, if I want to go, if I'm a sex offender and I want to go someplace, the simplest You've got one prosecutor who says, yes, this is a thousand feet, and another says no, and you've got a letter from the Attorney General's office saying, taking your child to school and going to get your child from school is okay, but others, prosecutors saying, no, it's not. I mean, it's ridiculous. Well, Your Honor, I don't think, first, that the prospect of there being a construction or varying interpretations necessarily makes a statute vague. That's what we have courts for, and if there's an issue with the statute and how it's to be applied Sometimes it does, though. Well, I would say, if there's You have to look at the people who are tasked with enforcing it, and there's no agreement among even those who are tasked with having to enforce and apply that on a day-to-day basis. Actually, the record demonstrates that there is. One of the statements, one of the testimonies we have is from Herbert Tanner, who was not only a former prosecutor, but also works for the Prosecuting Attorneys Association of Michigan, and his job is to train other prosecutors, and he testified that it is generally accepted that the measurement zone is property line to property line. It's 1,000 feet. So, if you want to go someplace, where do you want to go, measure 1,000 feet back and see if you find a school? Google Maps will show you where schools are, and it's a different color parcel on the land. Same thing with other maps. You can find the school zones very easily if you want to look at, use Google Maps, you want to use your car odometer, as one of the Doe's in this case actually did. If you want to use simply a phone book and a paper map Not a car that you're using routinely, and you didn't mention to the authorities. No, if you're violating the statute, you probably don't want to do that, but even then So how would you define routinely in that part of the statute? I think under the commonly used definitions of these terms, it's something you use regularly, often. The whole idea here was not that we're going to say three times and it's mechanically, or if you register all of your cars or all of your phones. We're trying to address the relationship the individual has. We're trying to address pattern and practice. This is, I think, an acceptable way of approaching it, because it then alleviates the problem of over-inclusive, capturing phones you use once and never again, and being under-inclusive where I may be capturing these three phones, but I'll just keep getting burner phones, use them twice and throw them away. If you drive to work, and you have to go by school in order to get to work, assuming that your workplace is a little bit outside the zone, but you have to go by the school every day, back and forth, is that covered by the statute or not? Absolutely. Looking at the statute, no, it's not covered, because you're not residing, you're not working inside the zone, and you're not loitering because you're not there. You're in it. Just being in the zone is not a violation. You have to be there for the period of time, and under circumstances that lead to the primary purpose of observing minors, driving by a school does not constitute loitering under any stretch of the definition. And I don't think that's even, that's not even one of the arguments the plaintiffs seek to raise here. And again, as far as the strict liability, I just want to emphasize, one thing we don't see, where does this supposed bar for strict liability come from? It certainly doesn't come from the United States Supreme Court, who has never said that states or even the federal government are barred from creating strict liability offenses. In fact, they've said quite the contrary. Furthermore... Is the best case saying that a case like this is not covered? I would say, I would point to Lambert and say, is this like Lambert? We have an, the case in Lambert addressed the idea of the guy walks into town without any prior notice, and they slap the handcuffs on him because he failed to register. That's not this case. We have sent out a written notice to every single offender saying, these are your obligations, these are your duties. People who come from other states, have you sent them notice too? I'm sorry? Well, if people come from other states, I would suggest that, first of all, this is not, Michigan is not alone in registering sex offenders. It is widely known, it is widely understood that sex offenders have registration obligations. So if you're moving to a new state, I think it behooves it. But just these people who are engaged in consensual sex? Well, you're not... Widely known that that's illegal? Well, if they're convicted in another state of a sex offense, that's, the other state has already determined that they have done something illegal. So if the idea is they're coming to Michigan and they don't know it's illegal to have sexual relations with someone under the age of 18, I think, you know, they're, I think that kind of begs the question. We know that there are strict liability offenses. Statutory rape is a strict liability offense, and in fact, that's what, that's the issue that several of the does in this case found themselves in, was they engaged, most of them minors. And so that's what got them in the registry in the first place. That's permissible to hold people criminally culpable, even if they didn't mean to have or mean to break the law, but in this case, they did. They knew what they were doing. They knew that they were under, that their partners were under 18, and they did it anyway. So I don't, and as far as consent, I don't think that, there's a lot of ambiguity here because I think the only, one of the does in this case, does number five, was convicted of straight up rape, and his allegation now is, well, I've talked to her since, and now she's got an affidavit saying, oh, it was, I was pressured by my father, and it wasn't really rape, but he was convicted. And now we're trying to go backwards in time and say, well, you know, the factual circumstances of that case were not, they really consented. I have a real problem with that because there is a jury verdict saying he did commit sexual assault without consent, and I think that kind of underscores the whole problem with this idea of dangerousness. Your Honor, you raised a question earlier about equal protection, and we get into this idea of, well, are they really dangerous? Do we need these individual determinations of dangerousness? We can't do that. The research and the tools they want us to use, I think one of the ones that's in the record is the static 99, which is used in the corrections context, but that doesn't work for juveniles. It doesn't work for women. My question was not just about dangerous, what I, the question I posed was about the statute that brings in dangerous people without the sexual component, and I referred specifically to the case of the robbery and kidnapping, obviously dangerous, but there was no sexual component in that particular case that I could see, but there was a minor who was kidnapped as a part of that. Right. So there's no question about the dangerousness there, but it brings in people who are dangerous and people who are dangerous, you know, in the sex crimes category. And as far as that goes, kidnapping is a listed offense, and I don't think that it, it's not a difficult leap to say why we consider kidnapping to be a listed offense in the sex offender registry because frequently one goes with the other, but the point I want to raise about equal protection is the idea that the tools they want us to use and the tools they urge to say, well, we can figure out who's a dangerous person and who will re-offend in the future by using these tools, it doesn't work for juveniles, it doesn't work for women, it doesn't work for offenders who are not native to the North American, you know, culture. So we have now established three different categories, age, gender, nationality, that they want us to distinguish and we cannot do it for these people and we'll do it for these. It engineers an equal protection problem down the road. I think that's a trap and I think that's something the court should be very cautious of getting too deeply into. I see that I'm out of time. Are there other questions from the court? There are not.  Thank you.